IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STEVEN LAZAR** | : | |
| | : | **CIVIL ACTION** |
| v. | : | No. 24-907 |
| | : | |
| **CITY OF PHILADELPHIA, ET AL.** | : | |

**McHUGH, J.**                                                                                                              **March 21, 2025**

**MEMORANDUM**

In 2010, Steven Lazar was convicted by a jury of second-degree murder. Thirteen years later, I granted Mr. Lazar's petition for writ of habeas corpus, based on a combination of deficient representation by counsel and failure to produce exculpatory evidence. The Commonwealth declined to retry Mr. Lazar. Now free, Mr. Lazar brings an array of civil rights claims against the detectives involved in the original investigation and the City of Philadelphia. Defendants have moved to dismiss several of Mr. Lazar's claims. For the reasons that follow, Defendants' Motions will be granted in part.

**I.     Facts as Pled**

In January 2007, Mr. Dario Gutierrez was found brutally murdered by a sharp linear object inside his North Philadelphia home. Compl. ¶¶ 35, 40, ECF 1. The Philadelphia Police Department's Homicide Division initiated an investigation, with Detective David Baker as lead investigator on the case.[1]  *Id.* ¶¶ 22, 36. Detectives processing the crime scene found no signs of forced entry in the home; the front and back doors, as well as the windows, were locked. *Id.* ¶ 38.

---

[1] Detective Baker was supervised by Lieutenant Melvin Williams. *Id.* ¶ 36.

Over the following weeks, a variety of leads arose, all of which were documented in the Gutierrez homicide file. *Id.* ¶¶ 56-57. Detectives received a tip that someone named Leon Ryans had "beat down an old head" in the area. *Id.* ¶ 43. Detectives did not follow up on this tip, despite Ryans' prior arrests for similar crimes. *Id*. After learning that Gutierrez had clashed with local drug dealers as a member of the town watch, Detectives identified two drug dealers who operated near Gutierrez's home – Hector Valentin and Melvin Martinez. *Id.* ¶¶ 41, 44. Detective Baker learned from Gutierrez's daughter that her family had previously been threatened by Emily Gonzalez, whose male associates had attacked the daughter's ex-husband. *Id.* ¶ 52. A woman in the neighborhood gave officers a different tip. According to the woman, neighborhood drug dealer "Money Mike" told her that Gutierrez was killed for "snitching" on local dealers. *Id.* ¶ 54. The woman told them the names of two dealers who sold in the area: "Flaco" and "Black," later identified by police as Victor Flores and Pablo Costoso. *Id.* Detectives did not follow up on any of these leads. *Id.* ¶¶ 43, 45, 53, 55.

Another detective received a "highly credible tip" from an informant that three men, two of whom were later identified as Victor Berrios and William Rosa, gained access to Mr. Gutierrez's home by having a woman knock on the door. *Id.* ¶¶ 46-47. The informant claimed these men drove a black, two-door Honda Accord when they did "their jobs." *Id.* FBI agents subsequently arrested Berrios on an unrelated federal indictment, and found a stained machete, crossbar, and stained-red boots in his home. *Id.* ¶ 48. Forensic testing by the PPD revealed that the stains on the machete and crowbar were not blood, and the test was inconclusive as to the boots. *Id.* ¶ 50. The PPD also impounded a black two-door Honda Accord registered to Rosa, but released it for auction in February 2007 – before it was processed for evidence. *Id.* ¶¶ 49, 51. No additional investigation into Rosa and Berrios occurred. *Id.* ¶ 51.

The investigation then came to a near halt, and in late February 2007 detectives began treating the investigation as a cold case. *Id.* ¶ 58. In April 2007 – over four months after the murder – another of Gutierrez's daughters discovered a suitcase in her father's backyard and notified detectives. *Id.* ¶ 65. Detective Baker had the suitcase picked up, inspected it a month later, and determined that it belonged to Steven Lazar. *Id.* ¶¶ 65, 67-68. That July, Detectives Baker and Weaver located Lazar, who voluntarily accompanied them to the Homicide Division headquarters for an interview. *Id.* ¶ 69. Mr. Lazar told the detectives that the suitcase belonged to him and had been lost several months earlier, denying involvement Gutierrez's murder. *Id.* ¶¶ 70-72. During the conversation, Mr. Lazar learned additional details about the murder, and was allowed to take his suitcase and leave. *Id.* ¶¶ 71, 73. Mr. Lazar subsequently told his roommate Russell Angely, Angely's partner Sarn Wilson, and others about his conversation with detectives and the details he learned about the murder. *Id.* ¶¶ 75-76. Meanwhile, the investigation once again went cold.

That November, Mr. Angely stole Mr. Lazar's drugs, leading to a fight between the men.[2] *Id*. ¶ 78. The police were called and took Angely into custody on an outstanding arrest warrant. *Id*. ¶ 79. While being arrested, Mr. Angely exclaimed that Mr. Lazar was wanted for homicide. *Id.* Because of this comment, Angely was taken to the Homicide Division and interrogated by Detectives Booker and Carlos. *Id*. ¶ 81. Angely told the detectives that Mr. Lazar had confessed

---

[2] Mr. Lazar has a long history of substance use disorders, as did Russell Angely and Sarn Wilson. *Id.* ¶¶ 59-62, 74. In 2007, all three were patients at the Goldman Clinic, which treated addiction and dispensed methadone. *Id.* ¶¶ 61, 74.

3

to murdering Gutierrez, and signed a statement to that effect. *Id.* ¶¶ 81-83.[3] As a result of this statement, the Homicide Division reopened the Gutierrez murder investigation and assigned the case to two detectives in their Special Investigations Unit: Detectives Booker and McDermott. *Id.* ¶ 85. Booker and McDermott subsequently brought Angely's romantic partner, Sarn Wilson, to the Homicide Division. *Id.* ¶ 86. Wilson signed a witness statement similarly claiming that Lazar had confessed to Gutierrez's murder.[4] *Id.*

With the two witness statements in hand, detectives arrested Mr. Lazar at his home the morning of November 19, 2007 and searched his apartment. *Id.* ¶ 88. No weapons or relevant evidence were found in his home. *Id.* ¶ 89. Lazar was taken to the Homicide Division headquarters and interrogated on and off for the next two days. *Id.* ¶¶ 91-117. Detectives Booker, McDermott, Rossiter, Kelhower, and Cruz were involved in his interrogation. *Id.* ¶¶ 92, 94, 108, 109.[5] Because of the interrogation, Mr. Lazar missed his daily methadone appointment, and began to experience withdrawal. *Id.* ¶¶ 88, 90, 92, 95, 100, 112. Lazar informed the officers he was in withdrawal and requested to be taken to the methadone clinic, but was denied treatment. *Id.* ¶¶ 90, 92, 95. Lazar repeatedly requested an attorney, but was not allowed to have one. *Id.* ¶¶ 96-97. Lazar also was denied food throughout the day. *Id.* ¶ 98. The detectives brought in a nurse, who said that Lazar either needed his medications or to be taken to a hospital. *Id.* ¶ 100. The detectives did neither.

---

[3] Lazar claims that this statement was false, motivated by their fight and Angely's desire to leave custody, and filled with facts that the detectives fed to Angely. *Id.* ¶¶ 81-83. Sarn Wilson, when arriving at the station to pick Angely up, told the defendants a similar narrative about Mr. Lazar. *Id.* ¶ 84.

[4] Similarly, Lazar claims that this statement was false and filled with information that Detectives Booker and McDermott fed to him. *Id.* ¶ 86.

[5] Additionally, Detective Baker entered the room before the interrogation began and "loudly berated Mr. Lazar, accusing him of killing Mr. Gutierrez." *Id.* ¶ 93. In response, Mr. Lazar repeated that he had nothing to do with the crime. *Id.* Baker then left. *Id.* ¶ 94.

That evening, Mr. Lazar signed a purportedly fabricated confession. *Id.* ¶ 104. Mr. Lazar was left in the interrogation room overnight without fresh clothes, food, or water. *Id.* ¶ 107. He vomited and soiled himself that night. *Id*. The next day, the interrogation continued and Mr. Lazar signed a new, modified confession. *Id.* ¶¶ 109-11. Finally, at 10:00 p.m. the second night, detectives took him to the hospital where he received treatment for his withdrawal. *Id.* ¶ 113. He again spent the night in the interrogation room. *Id.* ¶ 114. The following day, Mr. Lazar repudiated the signed confession, claiming it was false. *Id.* ¶ 115.

While Mr. Lazar was being interrogated, the investigation continued. Detectives Kelhower and Rossiter took statements from Mr. Lazar's downstairs neighbors, June Blase and John Barry. *Id.* ¶ 119. According to these statements, Mr. Lazar had told his neighbors that he had committed the murder. *Id.* The detectives also interviewed Mark Kendra, an acquaintance of Mr. Lazar's from the methadone clinic. *Id.* ¶ 120. Kendra allegedly denied that Mr. Lazar was involved in the murder, but was tricked into signing a statement incriminating Lazar. *Id*.

On November 20, detectives took the various statements – including the two confessions signed by Mr. Lazar – to the District Attorney's Office ("DAO") seeking approval to charge Mr. Lazar with Gutierrez's murder. *Id.* ¶ 121. The detectives withheld significant exculpatory evidence from the DAO. *Id.* ¶ 122. Mr. Lazar was subsequently arrested and charged. *Id.* ¶ 124.

In May 2010, the case went to trial. Mr. Lazar's confessions were introduced as evidence, and detectives involved in the interrogation testified that Mr. Lazar was alert and physically fine during the interrogation. *Id.* ¶ 130. Additionally, the four individuals who had signed witness statements – Angely, Wilson, Blase, and Barry – testified in accordance with their prior statements. *Id.* ¶ 132. They were all subject to significant cross examination and impeachment due to their substance use disorders and criminal history, but did not repudiate their original statements. *Id*.

The jury found Mr. Lazar guilty of second-degree murder, and Lazar was sentenced to life imprisonment without parole. *Id.* ¶¶ 134-35.

Years after the conviction, counsel for Lazar discovered that a stipulation about Lazar's methadone use introduced during trial was inaccurate, that Rosa's black Honda Accord had been in police custody but released unsearched, that other leads existed, and that a photograph of the backyard during the initial investigation proved that Lazar's suitcase was not there at the time of the murder. *Id.* ¶¶ 142-144. Subsequently, in March 2023 I granted Lazar's amended petition for habeas corpus as to three of his nine claims. *Lazar v. Att'y Gen. of Pennsylvania*, 659 F.Supp.3d 599 (E.D. Pa. 2023) (McHugh, J.).

Lazar now brings five constitutional claims under 42 U.S.C. § 1983 and a state malicious prosecution claim against the individual detectives involved with the 2007 investigation and the City of Philadelphia. In response, Defendants have filed partial Motions to Dismiss. Mot. to Dismiss of Def. Booker, ECF 44; Mot. to Dismiss of City of Philadelphia and the remaining Defendants, ECF 39.

## II. Standard of Review

Within the Third Circuit, motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

## III. Discussion

### A. Plaintiff Fails to State a Claim Against Defendants Williams, Verrecchio, Singleton, and Wilkins.

Defendants seek to dismiss all claims against Defendants Williams, Kuhlmeier, Verrecchio, Singleton, and Wilkins. ECF 44 at 9-12. When a plaintiff brings a 42 U.S.C. § 1983

claim against an individual defendant, they must "make[] sufficient allegations of a defendant's personal involvement by describing the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct." *Chavarriaga v. N.J. Dept. of Corrections*, 806 F.3d 210, 222 (3d Cir. 2015). "Allegations of participation or actual knowledge and acquiescence . . . must be made with appropriate particularity." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

Mr. Lazar fails to adequately plea that several defendants "have personal involvement in the alleged wrongs." *Id*. In his Complaint, Mr. Lazar summarily alleges that Detective John Verrecchio "aided in the investigation," "processed the crime scene," "conferred with the FBI about the tip received by Sergeant Wilkins." *Id.* ¶¶ 36, 38, 47. In similar fashion, the Complaint alleges that Detective Gregory Singleton aided in the investigation, processed the crime scene, and received information about several potential suspects but did not follow up personally. *Id.* ¶¶ 36, 38, 54. The sole allegation as to Sergeant Robert Wilkins is that he aided in the investigation by receiving a tip about three men entering the home and confirmed with his informant that one of the men was Victor Berrios. *Id.* ¶¶ 36, 46-47. This is the extent of the allegations as to these defendants, and the Complaint specifically acknowledges that the "defendant detectives placed all documents related to each of the [alternative] suspects and leads in the Gutierrez homicide file." *Id.* ¶ 57.

In essence, the Complaint asserts that these three detectives participated in the earliest stage of the investigation, months before Mr. Lazar became a suspect. They processed the scene, received or investigated tips, and documented their leads and tips in the proper file. None of these actions are unlawful, or create a reasonable inference that they participated in, or were aware of, the alleged wrongful conduct that occurred many months later. The Complaint includes a catch-

all provision claiming that "[t]o the extent any individual defendant did not directly participate in a specific portion of the investigation, all defendants learned of the below-described investigative conduct based on their regular communications with other individual defendants through the course of the investigation." Compl. ¶ 37. But "[a]llegations of participation or actual knowledge and acquiescence . . . must be made with appropriate particularity." *Rode*, 845 F.2d at 1207. Such a conclusory allegation does not suffice to create a reasonable inference that these three detectives knew of and acquiesced to unconstitutional behavior that occurred many months later. I will dismiss all claims against Verrecchio, Singleton, and Wilkins.[6]

Defendants also seek to dismiss claims against defendant Lieutenant Melvin Williams. The sole allegation against Lieutenant Williams is that he supervised Detective Baker. *Id.* ¶ 36. Supervisors are only "liable if they participated in violating plaintiff's rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violations." *Parkell v. Danberg*, 833 F.3d 313, 330 (3d Cir 2016) (citing *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 n.5 (3d Cir. 2010)). Detective Baker was in charge of the case from January 2007 until early November 2007. *Id.* ¶ 85. Though Mr. Lazar claims that the detectives failed to investigate a number of credible leads between January and November 2007, there are no allegations that Mr. Lazar's civil rights were violated during this time period. The Complaint

---

[6] Plaintiff cites *Wright v. City of Phila.* for the proposition that I should at this stage infer that all defendant detectives were personally involved in the constitutional violations. 229 F.Supp.3d 322, 337-38 (E.D. Pa. 2017); *see* Pl. Res. at 33, ECF 48. However, the underlying facts of the case make it distinguishable. The defendant officers in *Wright* were involved in the investigation at the time when plaintiff Wright was a suspect, and even interviewed witnesses who implicated Wright. But here, these detectives are not alleged to have been actively involved in the case at any point in time when Lazar was a suspect. The temporal distance between Detectives Verrecchio, Singleton, and Wilkins' alleged involvement and the emergence of Mr. Lazar as a suspect eliminates any reasonable inference that they were personally involved in or knew of the alleged constitutional violations.

therefore does not create a reasonable inference that Lieutenant Williams either participated in, knew of, or acquiesced to any of the events after his supervision ended, and these later events form the basis for the constitutional violations. All claims against Lieutenant Williams are therefore dismissed.

The case survives as to Sergeant Bob Kuhlmeier, albeit barely. The only allegation against Sergeant Kuhlmeier is that he supervised Detectives Booker and McDermott. *Id.* ¶ 36. But the allegedly unlawful activities occurred while Booker and McDermott controlled the investigation. Booker and McDermott interrogated Mr. Lazar for 30 hours in the Homicide Division's headquarters, allegedly denying him access to an attorney, access to medical care, and coercing him into signing false statements. I find that it is reasonable to infer that their supervisor – Sergeant Kuhlmeier – was in some way aware of this unlawful interrogation, and acquiesced. Further, the alleged fabrication of evidence, suppression of exculpatory evidence, and malicious prosecution all occurred while Booker and McDermott led the investigation. Though Plaintiff will need to prove that Sergeant Kuhlmeier participated in the violation of his rights or knew of and acquiesced to it, the Complaint narrowly states a claim against Sergeant Kuhlmeier.

**B. Plaintiff Fails to State a Claim for Coercion Against Detective Weaver.**

Defendants also seek to dismiss Mr. Lazar's coercion claim against Detectives Weaver, Kelhower, Cruz, and Sergeant Kuhlmeier.[7] Plaintiff alleges that "[t]he individual defendants coerced plaintiff Steven Lazar into signing fabricated inculpatory statements and/or aided and abetted the coercion of Mr. Lazar." Compl. ¶ 174. To sustain a coercion claim, a petitioner must

---

[7] Defendants also sought to dismiss the claim of coercion against defendants Wilkins, Singleton, Verrecchio, and Williams. I already concluded that Plaintiff failed to state any claims against these defendants, and thus do not need to address these defendants again here.

"point to some link between police misconduct and the confession." *Halsey v. Pfeiffer*, 750 F.3d 273, 303 (3d Cir. 2014).

In his Complaint, Mr. Lazar sets forth at length alleged conduct of the officers involved in his interrogation, including specific tactics that, when viewed in the totality of the circumstances, set forth a plausible allegation of coercion. Lazar alleges that Detectives Booker and McDermott interrogated him over the span of 30 hours, and as part of the interrogation denied him food and water, access to an attorney, medical care, and clean clothes after he soiled himself. *See* Compl. ¶¶ 88-117. Mr. Lazar further alleges that Detectives Kelhower and Cruz interviewed Lazar on the second day. *Id.* ¶ 109. Because of this involvement, there is a reasonable inference that these detectives either participated in or knew of and acquiesced to the alleged coercive interrogation tactics. As such, Lazar has stated a claim against Kelhower and Cruz.

Mr. Lazar has also stated a coercion claim against Sergeant Kuhlmeier, McDermott and Booker's supervisor. Though Mr. Lazar does not claim that Sergeant Kuhlmeier directly participated in the interrogation, at the motion to dismiss stage I find it reasonable to infer that he may have been aware of and acquiesced to the 30-hour interrogation taking place at headquarters and any coercive tactics being used by two detectives under his direct supervision.

In contrast, Mr. Lazar has failed to state a coercion claim against Detective Weaver. The Complaint merely alleges that Detective Weaver was partners with Detective Baker, took Mr. Lazar into custody for questioning in July, and during that July interview provided Lazar with non-public details about the murder. *Id.* ¶¶ 69, 122(b). Such allegations do not create a reasonable inference that Mr. Weaver knew that – months later – coercive tactics were used to elicit a false confession.

### C. Plaintiff States a § 1983 Fabrication of Evidence Claim.

Defendants claim that Lazar's fabrication of evidence claim must be dismissed because additional corroborating witness statements establish a reasonable likelihood of a jury finding guilt. ECF 39 at 12-14; ECF 44 at 8-9. When pleading a claim for fabrication of evidence, "if a defendant has been convicted at a trial at which the prosecution has used fabricated evidence, the defendant has a stand-alone claim under Section 1983 based on the Fourteenth Amendment if there is a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted." *Halsey*, 750 F.3d at 294.

At the motion to dismiss stage, Defendants' argument fails. Mr. Lazar specifically alleges that the statements of the testifying witnesses – Angely, Wilson, Blase, and Barry – were false, fabricated by defendant detectives, and included facts that detectives knowingly fed to these individuals.[8] Compl. ¶¶ 81-86, 118-21. Taking Mr. Lazar's assertions as true and drawing all reasonable inferences in his favor, there is a reasonable likelihood that, without the allegedly fabricated confession and the allegedly fabricated elements of the four witness statements, Mr. Lazar would not have been convicted in light of the dearth of physical evidence linking Mr. Lazar to the crime.

### D. Plaintiff States a § 1983 Claim Under *Maryland v. Brady*.

Defendants also move to dismiss Mr. Lazar's *Brady* claim, alleging that the detectives gave prosecutors the evidence allegedly withheld, thereby meeting their obligation. ECF 39 at 18-21;

---

[8] Given Mr. Lazar's allegations that the detectives knowingly fed facts to these individuals, Compl. ¶¶ 81-86, 118-121, it is reasonable to infer that detectives knew that at least part of the statements were fabricated.

ECF 44 at 12-14. Additionally, Defendants argue that the exculpatory evidence allegedly withheld is not material to Mr. Lazar's conviction.

"Under *Brady v. Maryland*, the prosecution's suppression of evidence favorable to a criminal defendant violates due process when the evidence is material to guilt or punishment. To establish a *Brady* violation, it must be shown that (1) evidence was suppressed; (2) the evidence was favorable to the defense; and (3) the evidence was material to guilt or punishment." *United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Favorable evidence may include exculpatory as well as impeaching evidence and evidence used to "attack . . . the thoroughness and even the good faith of the investigation." *Kyles v. Whitley*, 514 U.S. 419, 445 (1995); *see also Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 284 (3d Cir. 2016). Evidence is material when "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different" or when the disclosure "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009) (citations omitted)

In addition, *Brady* "reaches beyond evidence in the prosecutor's actual possession" to evidence that "the prosecutor knew or should have known" about. *Kyles*, 514 U.S. at 435. Accordingly, *Brady* suppression of evidence also occurs when the government does not turn over evidence to the defense that is "known only to police investigators and not to the prosecutor." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (citations omitted). But to be liable under *Brady*, officers must "affirmatively conceal material evidence from the prosecutor." *Gibson v. Superintendent*, 411 F.3d 427, 443 (3d Cir. 2005), *overruled on other grounds by Wallace v. Kato*, 549 U.S. 384 (2007).

12

Mr. Lazar specifically claims that defendant detectives intentionally withheld extensive exculpatory evidence from the prosecution, including: (1) that Mr. Lazar's signed statements were coerced; (2) that Detectives Baker and Weaver gave Mr. Lazar non-public details about the murder; (3) that detectives had fed false information to Angely, Wilson, Barry, and Blase; (4) that Mr. Lazar's suitcase was not in the yard at the time of the crime; (5) that detectives had leads on multiple other suspects that they did not investigate; and (6) that detectives withheld information about their investigation into Berrios and Rosa. Compl. ¶¶ 122-123. Accepting Mr. Lazar's allegations as true and drawing all inferences in his favor, I must conclude that he has sufficiently pled that evidence was suppressed and that this evidence is favorable to the defense.

Furthermore, this evidence is material. Evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Smith v. Holtz*, 210 F.3d 186, 197 (3d Cir. 2000) (citations omitted). "In judging materiality in a case involving multiple *Brady* violations, the Supreme Court has mandated that the effect of the violations should be 'considered collectively, not item by item.'" *Simmons v. Beard*, 590 F.3d 223, 234 (3d Cir. 2009) (citing *Kyles*, 514 U.S. at 436). Here, the alleged *Brady* violations, including detectives' failure to rule out viable alternative suspects, are amplified by the lack of physical evidence tying Lazar to the crime scene and the credibility issues of the four civilian witnesses testifying against Lazar. As such, there is a reasonable probability that the alleged *Brady* evidence may have altered the result of the proceeding. In fact, I previously concluded that "the memorandum on Rosa's car and the dearth of any investigation into Berrios and Rosa were withheld," that "th[is] evidence was favorable to Lazar," and that "this evidence is material, as there is a 'reasonable probability that, had the evidence been disclosed, the result of

the proceeding would have been different.'" *Lazar*, 659 F.Supp.3d at 615-16 (citing *Cone*, 556 U.S. at 469-70).

As such, Mr. Lazar's *Brady* claims cannot be dismissed at this stage in the litigation.

### E. Federal & State Malicious Prosecution Claims.

*1. Defendant Officers Are Entitled to Qualified Immunity Against the Fourteenth Amendment Malicious Prosecution Claim.*

Defendants move to dismiss Plaintiff's Fourteenth Amendment malicious prosecution claim on the grounds that they are entitled to qualified immunity. ECF 44 at 11-12; ECF 39 at 21-23.

"Qualified immunity shields government officials from personal liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *George v. Rehiel,* 738 F.3d 562, 571-72 (3d Cir. 2013) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). The doctrine is intended to give officers "breathing room to make reasonable but mistaken judgments about open legal questions." *Id.* at 572 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). Consequently, "[a]ny claim of qualified immunity must be resolved at the earliest possible stage of litigation." *Miller v. Clinton County,* 544 F.3d 542, 547 (3d Cir. 2008).

Officers are not entitled to qualified immunity if their conduct (1) "violated a . . . constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Rehiel*, 738 F.3d at 572 (quoting *al-Kidd*, 563 U.S. at 735). I do not need to undertake the two-part inquiry in sequential order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). It is defendants' burden to establish their entitlement to the affirmative defense of qualified immunity. *See Reedy v. Evanson*, 615 F.3d 197, 223 (3d Cir. 2010); *Richardson v. Barbour*, 2020

14

WL 4815829, at *11 (E.D. Pa. Aug. 19, 2020). Looking at the second factor first, Defendants thus "must prove that the [] constitutional right in question was not clearly established at the time of the incident." *Gaymon v. Borough of Collingdale*, 150 F.Supp.3d 457, 462 (E.D. Pa. 2015) (McHugh, J.). For purposes of this inquiry, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Schneyder v. Smith,* 653 F.3d 313, 329 (3d Cir. 2011) (citing *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).

Defendants have met their burden to show that a Fourteenth Amendment right to be free from malicious prosecution was not clearly established in 2007. Prior to 1994, the Third Circuit recognized the Fourteenth Amendment as creating such a right. *See, e.g., Losch v. Borough of Parkesburg, Pa.*, 736 F.2d 903, 907 (3d Cir. 1984) (analyzing a plaintiff's claim of a "violation of his Fourth and Fourteenth Amendment rights to be free from arrest without probable cause"); *see also Lippay v. Christos*, 996 F.2d 1490, 1502 (3d Cir. 1993).

These decisions were called into doubt by *Albright v. Oliver*, 510 U.S. 266 (1994). In *Albright*, a plurality held that malicious prosecution claims could not be grounded in substantive due process, pointing instead to the Fourth Amendment. *Id*. 274-75. Subsequent Third Circuit opinions created uncertainty as to whether a Fourteenth Amendment malicious prosecution claim was still viable. In *Torres v. McLaughlin*, the Third Circuit commented that it "d[id] not read *Albright* to hold that a malicious prosecution claim can only be based in a Fourth Amendment violation." 163 F.3d 169, 173 (3d Cir. 1998). But that same year, the Third Circuit strongly implied that the Fourth Amendment was the only viable constitutional source of a malicious prosecution claim. *Gallo v. City of Phila.*, 161 F.3d 217, 222 (3d Cir. 1998); *see also Halsey*, 750 F.3d at 290 n.14 (acknowledging the confusion within the Third Circuit post-*Albright*). Thereafter,

when discussing a different inconsistency between the approaches taken in *Gallo* and *Torres*, the Third Circuit noted that the fact that *Torres* was decided after *Gallo* "leav[es] its precedential value" in jeopardy. *Schneyder v. Smith*, 653 F.3d 313, 321 (3d Cir. 2011) (citing *Holland v. N.J. Dep't of Corr.*, 246 F.3d 267, 278 n. 8 (3d Cir. 2001) for the proposition that when Third Circuit case law is inconsistent, the earlier case controls); *see also Boyle v. Evanchick,* No. 19-3270, 2020 WL 1330712, at *3 (E.D. Pa. Mar. 19, 2020) (McHugh, J.) ("*Gallo* controls, and reaffirms the Fourth Amendment [malicious prosecution] standard").

Given this uncertainty, it cannot be said that a Fourteenth Amendment right to be free from malicious prosecution was clearly established in 2007.[9] Defendants are therefore entitled to qualified immunity as to this claim.

### 2. *The Remaining Malicious Prosecution Claims Are Adequately Pled.*

Defendants also move to dismiss Lazar's Fourth Amendment and Pennsylvania malicious prosecution claims. ECF 44 at 9-11; ECF 39 at 14-16.

---

[9] Almost every judge in this District has concluded that after *Albright*, there was no clearly established right under the Fourteenth Amendment to be free of malicious prosecutions. *See Ogrod v. City of Phila..,* 598 F.Supp.3d 253, 262 (E.D. Pa. 2022) (Padova, J.) (concluding that defendant officers are entitled to qualified immunity on a Fourteenth Amendment malicious prosecution claim); *Thorpe v. City of Phila.*, No. 19-5094, 2020 WL 5217396, at *16 (E.D. Pa. Sept. 1, 2020) (concluding that "a Fourteenth Amendment procedural due process right against malicious prosecution was not clearly established in 2008–and is still not clearly established for that matter"); *Thomas v. City of Phila.*, 290 F.Supp.3d 371, 382 (E.D. Pa. 2018) (same); *Handy v. City of Phila.*, No. 24-1905, 2024 WL 4309973, at *3 (E.D. Pa. Sept. 26, 2024) (Pappert, J.) (same); *Lewis v. City of Phila.*, No. 19-2847, 2020 WL 1683451, at *7-8 (E.D. Pa. Apr. 6, 2020) (Baylson, J.) (same); *Alicea v. City of Phila.*, No. 22-3437, 2022 WL 17477143, at *4 (E.D. Pa. Dec. 6, 2022) (Sánchez, C.J.) (same); *Saidi v. Rastegarpanah*, 2024 WL 5108445, at *5 (E.D. Pa. Dec. 13, 2024) (Kearny, J.) (same); *but see Crosland v. City of Phila.,* 676 F.Supp.3d 364, 374-79 (E.D. Pa. 2023) (Brody, J.) (denying qualified immunity on the limited grounds that the activity in question took place prior to the Supreme Court's 1994 *Albright* decision, at which time the right was clearly established in the Third Circuit).

A plaintiff asserting a Fourth Amendment malicious prosecution claim must establish that "(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *McKenna v. City of Phila.*, 582 F.3d 447, 461 (3d Cir. 2009). If a single element is not satisfied, the claim fails. A Pennsylvania malicious prosecution claim is identical, except it does not require a deprivation of liberty. *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 791 (3d Cir. 2000).

Defendants allege that Lazar's pleadings fail to establish that they lacked probable cause. They assert that "probable cause did exist based on the statements provided by Russel Angely, Sarn Wilson, June Blase, and John Barry." ECF 39 at 16. But I must accept as true "all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the [plaintiff]." *Foglia v. Renal Ventures Mgmt.*, 754 F.3d 153, 154 n.1 (3d Cir. 2014) (cleaned up). Lazar specifically pleads that defendant detectives knowingly fabricated the witness statements of Russel Angely, Sarn Wilson, June Blase, John Barry, and Mark Kendra, and presented them as true. Compl. ¶¶ 81-83, 86, 119-124; *see also id.* ¶ 37. Lazar further claims that his confessions were illegally coerced and fabricated. *Id.* ¶ 102-115. Necessarily, evidence that officers know is false and fabricated cannot alone establish probable cause. The only remaining evidence – the discovery of Mr. Lazar's suitcase in Mr. Gutierrez's backyard months after the murder – is insufficient by itself to establish probable cause. If Lazar can prove what he pleads, then probable cause did not exist to arrest and charge Lazar. These claims therefore survive.

### F. Plaintiff States a *Monell* Claim Against the City of Philadelphia.

Lazar also brings a § 1983 claim against the City of Philadelphia. Municipalities can be liable under § 1983 for violating a plaintiff's constitutional rights. *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978). Such a claim may proceed in two ways. "A plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, or that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice" through a failure to train, discipline, or supervise its officers. *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (cleaned up); *see also Crosland*, 676 F.Supp.3d at 379-80. Here, Lazar claims both theories. Compl. ¶ 177.

Defendants assert that Lazar fails to adequately plead a failure to train claim and that his custom theory is based on examples of police misconduct that are too temporally removed to be relevant. ECF 39 at 23-28. Additionally, the City of Philadelphia argues that the *Monell* claim should be dismissed to the extent it is based on a Fourteenth Amendment malicious prosecution claim, as that right was not clearly established at the time at issue. ECF 39 at 24.

"Municipal liability under § 1983 'is generally not amenable to resolution at the pleading stage, as it requires a plaintiff to plead facts outside his or her personal knowledge.'" *Crosland*, 676 F.Supp.3d at 380 (*citing 3909 Realty LLC v. City of Phila.*, No. 21-030, 2021 WL 2342929, at *4 (E.D. Pa. June 8, 2021)). Here, Mr. Lazar's pleadings are sufficient to survive under both a failure to train theory and a policy or custom theory.

Municipalities can be liable for damages under a policy or custom theory if there is "an official proclamation, policy or edict by a decisionmaker possessing final authority to establish municipal policy on the relevant subject," or "a given course of conduct so well-settled and permanent as to virtually constitute law." *Forrest*, 930 F.3d at 105-06. The municipality need not

act affirmatively; "deliberate indifference, lack of compliance and failure to adhere to . . . standards" can establish liability. *A v. Nutter*, 737 F.Supp.2d 341, 362 (E.D. Pa. 2010) (DuBois, J.). Alternatively, under the failure to train, discipline, or supervise theory, municipalities can be liable when the "failure or inadequacy amount[s] to deliberate indifference on the part of the municipality." *Forrest*, 930 F.3d at 105-106. Liability thus attaches when "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Forrest*, 930 F.3d at 106.

Mr. Lazar has alleged that the City was aware of constitutional violations but failed to discipline responsible officers or act. Compl. ¶¶ 148-64. Lazar describes repeated misconduct by the PPD Homicide Division, evidenced by news reports, in twenty-one other court cases, and internal and external investigations. Specifically, he alleges that the City of Philadelphia had a custom of "unconstitutional misconduct in homicide investigations, and in particular, using coercive techniques in interview and interrogations to obtain statements, fabricating inculpatory evidence, withholding exculpatory evidence, failing to investigate known exculpatory evidence, and otherwise failing to conduct constitutionally adequate investigations." *Id.* ¶ 149. Lazar alleges that these practices were "well known to the City of Philadelphia and its policymakers" from as early as 1977, *id.* ¶ 150, but that the City allowed these practices to persist to an extent that amounted to an well-settled course of conduct and failed to intervene through training, disciplining, or supervising detectives. Lazar further alleges that the Internal Affairs Division of the PPD did not impose meaningful discipline or sufficiently train officers despite rampant constitutional violations. *Id.* ¶ 163. As such, these claims are adequately pled.

Similarly, at this stage it is not appropriate to dismiss Lazar's *Monell* claim to the extent it is based on his Fourteenth Amendment malicious liability claim. As discussed above, it is not clearly established whether such a right exists under the Fourteenth Amendment. However, municipal liability is not tethered to the "clearly established" qualified immunity standard. *See Crosland*, 676 F.Supp.3d at 381-83 (reviewing Third Circuit and Supreme Court case law and concluding that, beyond the already "demanding" standards of municipal liability, there is no additional requirement that a right be clearly established).

Although Mr. Lazar faces a daunting challenge in proving a *Monell* claim, resolution is inappropriate at a motion to dismiss stage.

## IV. Conclusion

For the reasons set forth above, Defendants' Motions to Dismiss will be granted in part and denied in part. An appropriate order follows.

/s/ Gerald Austin McHugh<br>
United States District Judge